Shaw, C. J.
The plaintiff, an owner of land bordering on a salt water creek or inlet, declares in case against the defendant, alleging that he has placed a dam across the said creek, by means of which the flow of the ebb-tide is obstructed, whereby the plaintiff is prevented from draining his land and buildings.
As every owner of land is entitled to the use of a natural outlet of water for all useful purposes, whether it be a current of fresh or salt water, passing through or by his land, including necessary drainage, such an obstruction by another, on his own land, is a violation of that right, and affords a ground on which to claim and recover consequential damages, unless it admits of some justification or excuse.
The excuse in this case is, that the defendant had a right to erect a dam, by the mill acts of Massachusetts, and that if the plaintiff has sustained any damage by means of the dam, his remedy is by complaint under the mill acts to recover annual or gross damages, and that an action at common law cannot be maintained. This raises the question, we believe a new one in this commonwealth, whether the mill acts apply to a tide mill.' A tide mill is understood to be a mill, placed upon a dam thrown across a creek or inlet from the sea, in which the tide naturally ebbs and flows, and wherein the water is raised by the flow of the tide, and at high water and the turn of the tide, the water is stopped by tne dam and the sluice-gates, and kept to that height, untJ che tide has so *115 far ebbed below the dam, as to create a fall, by means of which the mill is worked a few hours, until the return of the flood tide prevents it. Is this a head of water which a mill-owner has, by the statute, a right to raise and maintain, to the damage of another?
The provision of the Rev. Sts. c. 116, § 1, is, that “ any person may erect and maintain a water mill, and a dam to raise water for working it, upon and across any stream that is not navigable, upon the terms and conditions, and subject to the regulations hereinafter expressed.”
The term “ navigable, ” in this provision, may be regarded as equivocal. It may mean not navigable for any useful purpose of trade or agriculture, as expressed in these cases: Commonwealth v. Charlestown, 1 Pick. 180; Rowe v. Granite Bridge, 21 Pick. 344. If this were the proper construction, it raises a question of fact, which has not been tried, and it would be necessary that further action should be had upon it.
The other sense of “ navigable ” is its technical sense, to designate all waters, where the tide ebbs and flows, in contradistinction to waters lying above the flow of the tide, although capable of some kinds of navigation. If this was the sense in which it was used by the legislature, it would end this case, because it is admitted that the creek in question was within the ebb and flow of the tide.
There is some ground to hold, that in the enactment cited, the term “ not navigable ” was used by the legislature in the latter sense, inasmuch as there are many dams, on considerable rivers, above tide water, which are sufficient to afford a valuable navigation, for rafts, boats and small vessels; and yet such dams are regarded as within the mill acts, which they would not be, unless these were rivers “not navigable” in the sense of the statute. This we believe is the sense in which the phrase has been here used and understood, as applicable to all rivers above the flow of the tide, and in general above the lowest falls and rapids, although to some extent useful for the passage of boats and rafts. Spring v. Chase 2 Dane Ab. 696; Commonwealth v. Chapin, 5 Pick. 199.
But the court do not decide the case on this ground, but *116 have rather preferred to examine it in reference to the policy and principle of the mill acts, and the scope of their provisions. Looking at it hr this point of view, we are of opinion, that the mill acts, in then principle and provisions, apply only to running streams of water, descending and continuous, originating in more elevated grounds, and seeking their outlet in the sea, or in some lake or larger river communicating with the sea.
As the effect and object of the mill act are to take away a common-law remedy for damage done to one’s land by a mill-owner, it is to that extent in derogation of the common law, and not to be carried by construction beyond its plain intent and meaning. , The principle on which this law is founded is not, as has sometimes been supposed, the right of eminent domain, the sovereign right of taldng private property for public use. It is not in any proper sense a taking of the property of an owner of the land flowed, nor is any compensation awarded by the public. It does not even authorize the mill-owner to use the land of another for a reservoir, against his consent; the owner of the land may if he choose, dike out his own meadow, and thereby prevent the flow of the water upon it. But the principle seems to be this: A man may place a dam on his own land, in order to raise a head of water for mills, in the use of which the public have an interest ; this is the extent of the direct authority given by the statute. But in doing this, by force of the natural law, -by which fluids seek a level, the water may, without the purpose and against the wish of the mill-owner, overflow the land of another, and do him some damage. Here the law steps in and declares, that in consideration of the advantage to the public, to be derived from the establishment and maintenance of mills, the owner of the land shall not have an action for this necessary consequential damage against the mill-owner, to compel him to prostrate his dam, and thus destroy or reduce his head of water; but it authorizes him to keep up his head of water to his own best advantage, having at the same time provided what the law deemed an adequate and practicable remedy for all the damage sustained, by a compensation in money, to be paid by the owner of the mill.
*117 Whether, if this were an original question, this legislation-would be considered as trenching too closely upon the great principle, which gives security to private rights, it seems now too late to inquire, such legislation having been in full operation in this state a century and a half; but we think the principle itself is manifest. The enactment in the revised statutes is very brief, but the principle is more definitely stated in the preceding statute, from which it was revised. St. 1795, c. 74, § 1. The preamble and enacting clause are thus : “ Whereas the erection and support of mills, to accommodate the inhabitants of the several parts of the state, ought not to be discouraged by many doubts and disputes, and some special provisions are found necessary relative to flowing adjacent lands, and mills held by several proprietors: Therefore, be it enacted, that where any person hath erected or shall erect any water mill on his own land,” “ and to the working of such mill it shall be found necessary to raise a suitable head of water, and in so doing any lands shall be flowed, not belonging to the owner of such mill, it shall be lawful for the owner or occupant of such mill, to continue the same head of water, to his best advantage, in the manner and on the terms hereinafter provided.” It then proceeds to provide for the ascertaining of damages, by a jury, if not otherwise agreed.
The system appears to us to be specially adapted to a continuous and descending stream of water. “ To raise a head of water,” by means of a dam, applies to a dam interposed in a descending current, by which the water is stopped in its course, set back, and thereby raised. The dam of a tide mill does not raise the water; it is raised by the influx of the tide, and merely retained a few hours by the dam. The term “ stream of water,” in its ordinary signification, implies a continuous current in one direction, and would Jiardly be understood to describe a creek or inlet, in which the tide ebbs and flows, twice in each day, on the same level
Various provisions of the statute lead to tht same conclusion. No such dam shall be erected to the injury ol any mill, above or below it, on the same stream. Rev. Sts. c. 116, § 2. This *118 is inapplicable to a level tide-water creek. Besides, two tide mills, one above another, could hardly exist and be used on the same creek. The upper could not work, till the pond of the lower should be exhausted, on account of back-water; and the lower could derive no benefit from the pond of the upper, because it could receive no water from it, at each tide, until the lower had done working. By § 3, the height to which the water may be raised, and the season of the year during which it may be kept up, are to be regulated by the jury. These provisions are wholly inapplicable to tide mills, but essential to the use of meadows bounding on a continuous stream. The height of the dam has no tendency to fix the height to which the water may be raised by the tide. The other clause distinguishes between a winter mill privilege and a constant one. In reference to the former, the dam shall be left open, for the benefit of the land-owner, from a certain day in spring, through the summer, to allow the growth of grass and the making of a crop of hay.
Without pursuing these distinctions further, we think it will be found, that they are well adapted to mills on continuous watercourses, and not to tide mills. If it be said that the language of the statutes is thus used, because more pecúliarly applicable to the majority of cases, but without any forced meaning may be applied to tidal creeks, it may be remarked, that the language is general, and in terms applies to all the cases within the first section; that the laws which govern the movement and action of tide waters, through a level creek, in very short alternate periods, are so different from those which govern an onward current, that if tide-water creeks had'been intended by the legislature, they would have so expressed themselves, and some special regulations adapted to such creeks would have been provided.
On the whole the court are of opinion, that the mill acts were intended to regulate the right enjoyed by every owner of land, through which a running stream of water, profluens aqua, passes, to appropriate to himself, as a valuable incident to his estate, the mill power, for hydraulic purposes, derived from the force of a descending watercourse; that a tide mill *119 does not come within the purview of these acts, and that the defence offered in the present case cannot be admitted.

Defendant defaulted.

The second case, which was argued by the same counsel, at the same time, and with a like result, was precisely similar to the first case in all respects, except that there were no buildings on the plaintiff’s land.